## MAYCO CO. v. KENNETT COTTON CHOPPER MFG. CO.

### No. 1411.

United States District Court
E. D. Missouri, Southeastern Division.
Sept. 25, 1951.

118

Lawrence C. Kingsland and Estill E. Ezell (of Kingsland, Rogers & Ezell), of St. Louis, Mo., for plaintiff.

Lawrence H. Cohn and Frederick M. Woodruff, of St. Louis, Mo., for defendant.

HULEN, District Judge.

Plaintiff charges infringement of Patent No. 2,505,560, issued to William H. and C. R. Mayberry, acquired by plaintiff by assignment, on a structure known as the "Mayberry" or "Mayco" cotton chopper, by defendant's manufacture and sale of the "Delta" cotton chopper. The issues are: (A) Invalidity of plaintiff's patent because of (1) lack of invention, (2) anticipated by prior art, (3) prior public use; and (B) non-infringement by defendant.

There have been many efforts to develop a practical mechanical cotton chopper over a period of years. The problem which inventors have endeavored to solve results from the necessity of planting cotton seed and securing initial growth of plants at short intervals in the row. When the cotton plants are three or four inches tall, in the desired stand, they must be thinned. The thinning of the young plants has been done by hand labor, using a common garden hoe. With modern economic conditions, the increased cost of labor, the desire of the industry for a mechanical cotton chopper to thin the plants has become urgent.

The Mayberrys started experimenting with a cotton chopper in 1944. They made their first model from a cut out disc off a disc cultivator. Grooves were spaced and cut in the periphery, or cutting edge, of the disc. The disc was operated at an angle to the cotton row, the cutting edge slightly below ground level. In theory the grooves made in the cutting edge were to pass over the plants to be left in the row; the others were taken out by the cutting edge of the disc. By increasing the width of the groove in the cutting edge of the disc more plants would be left in the row. Decreasing the width of the groove increased the number of plants cut out. This form of structure was not new. It did not work satisfactorily. The cutting edge of the disc, cutting into the soil in the cotton row, disturbed the root systems of the plants left standing. Young cotton plants are very tender and if the root system is disturbed the growth is retarded or the plants die. In 1946 the Mayberrys changed their structure by adding a cutting blade to that part of the disc periphery which was not cut out and setting the cutting blade at an outward angle from the disc and attaching a shoe to the inside of the disc opposite the cutting blade. The result desired was obtained by the improved device—when the disc was operated oblique to the cotton row the cutting blade attachment sliced off the cotton plants at approximately the same angle as a hoe wielded by manpower. The shoe attachment kept the disc from cutting into the earth beyond a determined depth and firmed the ground of the plants left in the row, resulting in protection to the root sys-

tem of the plants left standing. This structure was first tried in 1946. In the Spring of 1947 it was demonstrated on row cotton, at cutting stage, in the presence of a number of cotton planters. The demonstration resulted in approval by the cotton planters present and a request that the chopper be made available to them. The patent was applied for on January 9, 1948.

Early in 1948 and for the cotton season of that year the Mayberrys contracted with James E. Terry to manufacture the cotton chopper. (He owns one-half of the stock of defendant and is active in directing its operations.) Forty-six pair were manufactured by Terry and immediately sold, without the benefit of advertising. The following season the Mayberrys and Terry were unable to come to terms on the cost of manufacture. The Mayberrys had the choppers made elsewhere. They sold the cotton chopper to the planter for $95.00 a pair. After the Mayberrys took the manufacturing contract from Terry he continued to manufacture the cotton chopper. It was labeled "Delta", and is the accused structure. The defendant company was formed in 1950, with Terry as its vice-president, and has since been and is now engaged in manufacturing and offering for sale the "Delta" chopper, as a successor to Terry individually. The defendant's chopper carries a statement "Patent applied for". Terry has applied for a patent on certain features of the structure, but not the shoe or cutting blade. In 1949–50 defendant made over five hundred pairs of choppers.

A farmer named Russell, living in the vicinity of the Mayberry farm, testified that in 1936 he constructed a cotton chopper by use of a disc. The only alteration he made in the disc was to cut grooves in the outer edge of the disc to pass over the plants that were to remain in the row. About 1945, he claims, he added a shoe, or a "foot". The foot was added to prevent the blade from sinking into the ground. It is not claimed that a cutting blade, such as on plaintiff's and the accused structures, was ever used or attempted. The shoe on the Russell chopper does not serve the purpose of firming the ground as in the Mayco or Delta cutter. The cutting edge of the

disc on the Russell chopper has a digging action and does not slice the plants. It disturbs the root system. It has no commercial value. Yancy had a similar experience.

Claim No. 2 of plaintiff's patent reads as follows:

"2. A plant thinner to be carried upon a frame supported by spaced wheels, said chopper being supported to travel along a plant row in a direction paralleling the path of travel of said wheels and comprising

"1) a wheel body having a plurality of spokes,

"2) a plurality of spaced segmental foot plates each carried by a spoke and having a ground contacting face directed radially outwardly and curved in the direction of the circumference of the wheel, and

"3) a plurality of cutting blades each carried by a spoke adjacent to a foot plate and

"a) having its cutting edge disposed slightly radially beyond the said face of the adjacent foot plate,

"b) the said blades each further having its cutting edge directed laterally outwardly from the side of the wheel opposite from the foot plate at an angle slightly oblique to the said face of the adjacent foot plate and away from the center of the wheel."

We quote from claim No. 1, bearing on the cutting edge: " * * * cutting edge of each blade being located slightly radially beyond the ground contacting face of the adjacent foot and directed away from the foot on a line closely approaching a parallel relation to the face of the foot."

The specification to which the quoted claims are directed reads:

" * * * When the attachment is urged forwardly it will turn or rotate so that the cutter blades will move across the row, below the ground surface, with a slicing movement and slice or cut off a number of plants in the row, and the feet 23 of the slides A will engage the ground between the plants to be left standing.

"As a result of the foregoing operation the earth which is disturbed by the cutting blade will be pressed back firmly between

the remaining standing plants. This pressing or firming of the earth prevents the remaining standing plants from falling over or being washed out of the ground in the event of a sudden rain.

"It will also be noted that the cutting edge 21 of each blade is directed away from the adjacent foot 23 at a very slight angle to the face of the foot and that the blade also extends only a very slight distance radially beyond the earth contacting face of the foot. Thus, it will be apparent that the edge 21 of each blade does not chop down into the earth but moves very nearly horizontally across the plant row and also it has only a very slight penetration so that a minimum of earth disturbance results.

"The cutter disk rotates about the stud shaft 28 in consequence of the frictional action between the cutter blades and the ground and between the feet of the slides and the ground, so that the cutting blades remove the plants encountered by the cutting edges. The cut outs 12 in the body plate B permit the plants left in the rows to stand upright without being damaged in any way."

## I.

■ Plaintiff's patent carries a presumption that it is valid. Defendant claims it merely represents "an assemblage of old and well known parts, all of which perform their same, old familiar functions in the way they did in the last century".

Cotton choppers have been the subject of study for nearly a century. Inventors, obsessed with a false sense of utility of their own creations (which is understandable), have been applying for patents during that period. But no chopper came near to solving the problem of replacing hand labor, in chopping cotton, prior to the appearance on the market of the Mayco and Delta choppers. .

Plaintiff's patent is composed of combination claims. During almost a century of effort by inventors who were informed of the problems of the cotton producing industry, and demand for a practical cotton chopper, no one came forward with the combination in issue until the Mayberrys discovered and assembled the Mayco chopper. Aided by "hind-sight", the infringer is moved to now point to any one of numerous patents, and declares "that", suggests "this", but not until "this" was produced by the Mayberrys did any one make such a deduction—not even Terry.

The circumstances surrounding defendant, and its assignee Terry, in the manufacture and sale of "Delta" choppers, does not appeal to a court of equity. .

The Mayberrys took the manufacturing arrangement from Terry in 1949. This did not affect the activity of Terry. Terry and then the defendant corporation continued to make the chopper. The chopper made by them imitated, in fact duplicated, as to the shoe and cutting blade, the Mayberry chopper, in these essential elements. Terry found a ready market for the choppers made by him. He, through defendant, still persists in making the duplicate chopper. Terry was acquainted with the problems of the cotton planters. Such imitation constitutes some evidence, not only of the favorable view defendant's assignor and vice-president and defendant take of plaintiff's patent, but reflects the same attitude, to some degree, of those engaged in the cotton industry and who desire to use a chopper in the production of cotton.

In correspondence with plaintiff, in which plaintiff was protesting infringement by Terry, Terry declared an intention to seek a patent on the cotton chopper. A patent on some parts, relating to applying the chopper to the motive power, has been applied for by Terry. But for Mayberrys' patent application, we have no doubt Terry would have applied for a patent on the elements of the device involved in this case—the shoe and cutting blade. The minute singling out by defendant, or Terry, of parts other than the shoe and cutting blade, on which to apply for a patent, further shows the value defendant places on the chopper. These parts have no value absent the shoe and cutting blade.

Defendant in its sales literature stresses those elements and function of the structure which are set forth in the claims and specification of the Mayberry patent. They

are held out to the public by defendant as new and useful in the cotton industry. With both representations we agree.

When the patented chopper was first publicly demonstrated by Mayberry there was an immediate demand made on Mayberry to purchase choppers of the same kind, by the cotton planters who witnessed the demonstration and who know the problem faced by the industry in thinning cotton. No prior advertising had been done. Orders came at once. The Mayberrys found a ready market for all Terry could manufacture the first year. Defendant found a ready market for the sale of the imitation.

Witness Paullinger impressed the Court. He had a practical background of experience in raising cotton of over 20 years. He holds a Master's degree in Agriculture. He has made a study of production methods and the economic phases of the industry. He has investigated many cotton choppers. He gave it as his opinion that plaintiff's chopper was a practical chopper, 1epresented an advancement in the art, and v²as the most satisfactory cotton chopper on the market. Plaintiff's chopper is not a complete or the final answer to the problem of replacing hand-chopping but where conditions are normal, Paullinger stated, its use is practical and results in a substantial saving in production costs. There was other evidence to the same effect.

The choppers sell by plaintiff for $95.00 a pair. The cost of hand hoeing is six times that of mechanical chopping by use of plaintiff's chopper, under normal conditions.

The plaintiff's patent represents a real contribution and advancement in the art of developing a mechanical cotton chopper. It represents progress in solving a problem that has perplexed inventors for over ninety years. The invention is placed within the reach of those engaged in raising cotton, at a price that is not prohibitive and has been accepted by cotton planters for its benefits in production of cotton over the old hand-hoe and manual labor.

■ Now that we have plaintiff's structure before us its simplicity is striking.

Why it was not sooner discovered is amazing. Simplicity of design does not destroy validity of a patent. It may show the "flash of genius". The feature of the structure set forth in the claims, of the combination of the shoe and cutting blade operating as described in the specification, represents inventive genius rather than mere mechanical skill. While not conclusive on the question of inventive genius or mechanical skill, it does not destroy the former or affirm the latter to suggest that if only mechanical skill was required, why have not mechanics who have worked on the problem for a century come forward with the combination. We think something further than mere mechanical skill was needed. The Mayberrys supplied inventive genius. Therein lies the invention.

■ It is our conclusion defendant has failed to carry the burden. Not only by virtue of the presumption of issuance is plaintiff's patent valid, but the record shows affirmatively that it meets the test as an invention resulting from discovery.

We are not impressed by defendant's argument concerning the difference in angle of the cutting edge in the patent drawings of plaintiff's patent and the physical exhibits of the Mayco and Delta choppers, and failure of the claims in the patent to state the exact angle of the blade to the shoe or disc. The claims point to operation of the cutting edge in cutting cotton plants with a minimum of ground disturbance to the remaining plants, resulting both from the position of the cutting edge and the shoe. In the claim the position of the blade is stated as "on a line closely approaching a parallel relation to the face of the foot" and "slightly oblique". We think, considering the character of structure under scrutiny and its use, and taking the language of the claims, this is sufficiently clear and specific language to tell any reasonably intelligent person how the structure is made. A variance of a few degrees would not affect the operation as set out in the specification.

II.

■ The answer listed 37 patents, claimed to show prior art. Defendant of-

fered an exhibit (No. 9) containing 10 of the 37. We have examined the exhibit.

Defendant by brief refers only to Sibley Patent No. 367,552, Clark Patent No. 407,-512, and Chong Patent No. 1,896,391. The only argument devoted to this prior art is —"Examples of such arrangement [referring to "cotton choppers utilizing blade elements which are so positioned on the chopper wheel as to be directed substantially horizontally to the cotton stalks thereby effecting a cutting action rather than a chopping or hoeing action"] of cutting blades in the cotton chopper art are to be found" in this prior art.

Going first to the Sibley patent, we quote from the specification: "This invention relates to a novel form of cotton chopper and cultivator, the object of the invention being to provide a machine which may be used as a cotton-chopper to remove all surplus plants and to accurately define the row, and which may subsequently be adjusted so as to operate as a cultivator for the plants as they increase in growth."

As to its function this is said: "This implement is designed to be drawn by a team, the beam to run directly over the proposed line of the row. As the machine is drawn forward, the disks 20 will act to throw the dirt away from the row, and the wheels 15 in revolving will, through the medium of the gears 16 and 17, impart a rotary motion to the shaft 18, and as said shaft so revolves the hoes 22 will be carried forward and will cut out certain portions of the row, leaving the plants which come between the spaces between the hoes. In order that the hoes 22 will not cut too deep in close proximity to the plants, I have made the outer faces of said hoes convex, as described."

Here we see, in the chopping part of the multiple structure, the disc acting to "throw the dirt" away from the row; the shape of the "hoes" (convex) so as to prevent the hoes going too deep. There is no suggestion here of a shoe to act as a firming agent. The disc operates across the cotton row at right angle. The patent is of 1887. That it was not practical is evident from its non-use.

The Clark patent covers a structure similar to that of the Sibley patent. In the Clark specification is absent any reference to regulating the depth of the cutters. The patent is dated 1889.

Chong's patent goes to the subject of— "used to chop up asparagus roots". It is on the same general principle as the two above referred to.

In applying the cutting blade, first to the common disc and then to an arm, plaintiff's structure closely mitates, when in operation, the cutting action of a hoe. This result is achieved by placing the cutting edge so that it operates obliquely to the cotton row, and on substantially a parallel relation to the face of the shoe. The shoe is of sufficient weight to firm the ground disturbed by the cutting blade. This represents a combination, the elements of which are old in the art. But the combination is new as of plaintiff's patent and the combination produces a new and useful result and meets a large demand of those engaged in producing cotton.

## III.

■ Evidence offered by defendant of prior use in the Russell and Yancy choppers fails of its purpose because neither the Russell or Yancy Chopper bears on the plaintiff's patent as set out in the claims. The choppers of Russell and Yancy do not use the shoe to firm the ground around remaining plants. There is no cutting blade attachment, nor does the cutting blade itself extend laterally outward from the side of the disc opposite the foot. It is in a substantial right angle to the face of the foot and substantially vertical in itself, there being no effort to change the alignment of the original disc periphery out of which it is made. What is the result? The Russell and Yancy choppers cause the cutting blade to dig into the earth disturbing plants that remain. This is precisely what plaintiff's device, by the combination of shoe and cutting edge, does not cause. Therein is the practical usability and value of plaintiff's structure.

Our finding that plaintiff's patent is not invalid by prior art is, for purposes of this case, a finding that the Russell and Yancy

structures do not bear on plaintiff's structure. Both the Russell and Yancy structures are anticipated by prior art. This makes it unnecessary to consider dates of use of the Russell and Yancy devices.

## IV.

Evidence of the infringement of the Delta chopper, manufactured and sold by defendant, on plaintiff's patent, leaves no room for argument in our judgment. Terry took over the combination of shoe and cutting edge literally from the drawing furnished by Mayberry. Neither defendant nor Terry make even a pretense of originating this combination or getting it from the prior art. Instead defendant stresses the difference in application of the chopper to the power supplied for its operation such as a cultivator or tractor, adjustment mechanism of the cutting blade and shoe, and degree of angle of the cutting blade to the shoe surface. The angle feature we have passed on. There is a distinction, in details, in the construction of the two choppers for purpose of application to operating machine and adjustments. Under the facts of this case they are essentially the same. The doctrine of equivalents applies. The cutting blade and shoe are in approximately the same position on the Mayco and Delta choppers. There may be a slight variation in the angle of the cutting knife which is without significance in its operation. Each performs the same function in the same way and obtains the same result. If plaintiff's chopper patent is valid, defendant's chopper infringes. Plaintiff's patent is valid. Defendant's chopper infringes.

That it is the shoe, its size, its relation to the cutting edge, the cutting edge, the position of the cutting edge and shoe and the operation of the combination, that represents the value of the Mayco chopper, and the Delta chopper, and not any difference in mechanical means of attaching the chopper to the motive power or the manner of adjustment, as between the two choppers, is shown conclusively in Terry's testimony. It was that if he were given the right to manufacture and sell the Russell chopper he would not be interested. The devices to apply the chopper to the motive power and adjust the blade and shoe could be applied to the Russell or Yancy structure. The Russell and Yancy choppers have no sales value. The plaintiff's has.

Plaintiff will submit decree. If additional findings or conclusions are desired requests will be submitted within ten days from the date of filing of this memorandum.